UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TERRI TARWATER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV 1974 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Terri Tarwater for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of the Complaint.  (Document Number 20).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 25).

## Procedural History

On August 4, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on August 31, 2004.  (Tr. 73-77, 443-48).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 4, 2008.  (Tr. 39-54, 17-24).

On August 20, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 6-10).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

<h3 align="center">Evidence Before the ALJ</h3>

**A.      ALJ Hearing**

Plaintiff's administrative hearing was held on February 5, 2008.  (Tr. 616).  Plaintiff was

present and was represented by counsel.  (Id.).  Vocational expert George Horne was also

present.  (Id.).

The ALJ examined plaintiff, who testified that she was born on March 17, 1977.  (Tr.

619).  Plaintiff stated that she dropped out of school in the sixth grade.  (Tr. 620).  Plaintiff

testified that she believes she was held back in kindergarten.  (Id.).

Plaintiff testified that she struggles when trying to read a newspaper article.  (Id.).

Plaintiff stated that she was taking reading classes at the time of the hearing.  (Id.).  Plaintiff

testified that she remembers words when she sees them.  (Id.).

Plaintiff testified that she is unable to write even a short note.  (Id.).  When asked by the

ALJ if she could write a note indicating that she had gone to the grocery store and that she would

be back in thirty minutes, plaintiff testified that she could probably write "be back."  (Tr. 621).

Plaintiff testified that she was four-feet, eleven-inches tall, and weighed 130 pounds.  (Id.).

Plaintiff stated that she did not drive.  (Id.).  Plaintiff testified that she did not have a valid

driver's license as she let her license expire.  (Id.).  Plaintiff stated that she believed she could see

well enough to drive.  (Tr. 622).

- 2 -

Plaintiff testified that she has applied for jobs in the three-and-a-half-year period prior to the hearing, and she has also worked during this period.  (Id.).  Plaintiff stated that the longest period she has worked during this time was a week-and-a-half.  (Id.).

Plaintiff testified that she has no side effects as a result of the medications she takes.  (Id.).

Plaintiff's attorney then questioned plaintiff, who testified that she has no vision in her right eye due to a detached retina.  (Tr. 623).

Plaintiff testified that she resided at Hope House, which was an institutional house for women run by Carol Jones.  (Id.).  Plaintiff stated that Hope House provided a supervised, structured environment.  (Id.).  Plaintiff testified that she attends classes for her "illness" daily between 9:00 a.m. and 12:00 p.m., attends reading classes from 1:00 p.m. to 4:00 p.m., attends a Narcotics Anonymous ("NA") meeting, and then goes home.  (Tr. 623-24).  Plaintiff stated that Hope House has a "house mother," who stays at the house overnight to supervise the residents. (Tr. 624).

Plaintiff testified that she had been sober for sixty-five days at the time of the hearing. (Id.).  Plaintiff stated that the structured environment at Hope House has worked really well for her.  (Id.).  Plaintiff testified that she was "lost" and depressed without structure.  (Tr. 625). Plaintiff stated that she also receives psychological counseling weekly at Hope House, and that this has been helpful.  (Id.).

Plaintiff testified that she has had food service jobs and cleaning jobs in the past.  (Id.). Plaintiff stated that she has had difficulty keeping jobs, and that since August of 2004, her longest job lasted a week-and-a-half.  (Id.).  Plaintiff explained that she typically becomes depressed and

- 3 -

confused while working because she is unable to read or write and has anxiety.  (Id.).  Plaintiff

testified that due to her illness, she is unable to cope with business environments and becomes

frustrated and aggravated.  (Id.).  Plaintiff stated that she has walked off of a few jobs for these

reasons.  (Id.).

Plaintiff testified that when she was working as a waitress, she took food orders by

memory because she was unable to write.  (Tr. 626).  Plaintiff stated that she frequently made

errors due to her inability to read, and quit one position four times in a nine-month period for this

reason.  (Id.).

Plaintiff testified that she has been diagnosed with major depression,[1] post-traumatic stress

disorder,[2] panic disorder[3] with agoraphobia,[4] and bipolar disorder I.[5]  (Tr. 626-27).  Plaintiff

stated that due to her psychological problems, she becomes aggravated and will occasionally

"snap" because she is unable to control her emotions.  (Tr. 627).

Plaintiff testified that she was unable to hold a full-time job at the time of the hearing

---

[1]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's Medical Dictionary, 515 (28th Ed. 2006).

[2]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.  Stedman's at 570.

[3]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[4]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided.  Stedman's at 40.

[5]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's at 568.

because she was trying to get her illness under control.  (Tr. 628).  Plaintiff stated that she was trying to learn how to read and write, but she was only at the third-grade level.  (Id.).

Plaintiff testified that, before she entered the program at Hope House, she had no structure in her life.  (Id.).  Plaintiff stated that in a typical day, she just slept and survived.  (Id.). Plaintiff testified that she alternated between living with boyfriends and living with her mother. (Tr. 629).  Plaintiff stated that she attempted the Carol Jones program in 2005, but did not complete it because she did not think she was ready.  (Id.).

The vocational expert, George Horne, questioned plaintiff regarding earnings in 2006 of $9,000.00 from "self-employment."  (Tr. 630).  Plaintiff testified that she worked with another man performing irrigation and sod landscaping services.  (Id.).  Plaintiff stated this was a temporary job in the fall of 2006 that lasted more than a week, although she did not recall exactly how long she performed this job.  (Tr. 631).  Plaintiff stated that this job ended when her partner quit.  (Tr. 632).  Plaintiff testified that she did not work eight hours a day at this position, and that she could not have performed this job full-time.  (Id.).

The ALJ then examined Mr. Horne.  (Tr. 632).  Mr. Horne characterized plaintiff's past work as waitress, which was semi-skilled and light; child daycare center worker, which was semi-skilled and light; and landscape/laborer, which was unskilled and light.  (Tr. 633).

The ALJ asked Mr. Horne to assume a hypothetical claimant with a formal marginal education, an affective mood disorder, substance dependence currently in remission, personality disorder, history of a right retinal detachment, and the following limitations: no physical limits but must avoid climbing of or exposure to significant unprotected heights, potentially dangerous and unguarded moving machinery and commercial driving; requires an even surface upon which to

stand and walk; requires simple repetitive one, two or three-step job instructions; requires work that would not involve public contact and no more than minimal contact with co-workers and supervisors; no team work duties; no more than minimal use of independent judgment; no change in the work setting; no more than simple rote words use with checkmarks or signatures; and no mathematics other than simple addition and subtraction. (Tr. 633-34). Mr. Horne testified that the individual would be unable to perform plaintiff's past landscaping work. (Tr. 634). Mr. Horne stated that the individual could perform the light, unskilled positions of office helper (130,000 positions nationally, 1900 positions in Missouri); and housekeeping/cleaner (240,000 positions nationally, 5,000 positions in Missouri). (Tr. 636-37).

The ALJ next asked Mr. Horne to assume the limitations found by Dr. Joan Bender. (Tr. 638). Mr. Horne testified that these limitations would preclude work. (Id.).

The ALJ also asked Mr. Horne to assume the limitations found by Dr. Sharol McGehee. (Id.). Mr. Horne stated that these limitations would preclude work. (Tr. 639).

Plaintiff's attorney asked Mr. Horne to comment on the number of absences per month found by Drs. Bender and McGehee. (Id.). Mr. Horne testified that four absences per month would be in excess of tolerance for absence in the work place. (Id.).

Plaintiff's attorney then re-examined plaintiff, who testified that she only worked two to three times a week for about two months at the landscaping job. (Tr. 640). Plaintiff stated that she was paid $10.00 per hour, and was paid cash. (Id.). Plaintiff testified that she did not earn $9,000.00 at this position. (Tr. 641). Plaintiff stated that her tax preparer spoke with her employer, who incorrectly reported that she earned $9,000.00. (Id.). Plaintiff explained that this individual was paid to sod yards and did not perform the work. (Id.).

- 6 -

The ALJ acknowledged that plaintiff's employer misreported her earnings and that this error was not plaintiff's fault. (Id.). The ALJ found that this work was not substantial gainful activity. (Id.). The ALJ indicated that if she found disability, she may consider this part of a trial work period. (Tr. 642).

## B.      Relevant Medical Records Before the ALJ

The record reveals that plaintiff received treatment for depression at Doctor's Hospital of Springfield on August 30, 2002, and October 1, 2002. (Tr. 398-405, 395-97). Plaintiff was treated with medication. (Id.).

Plaintiff was admitted at St. John's Regional Health Center from January 18, 2005 through January 24, 2005, following her presentation to the emergency room where she sought treatment for depression and cocaine dependence. (Tr. 172-73). Plaintiff reported that she had used crack cocaine and ecstasy three days prior to her admission. (Tr. 183). Plaintiff indicated that she had been using crack cocaine daily for about the past two years. (Id.). Plaintiff complained of mood lability. (Tr. 184). Plaintiff indicated that she wished to discontinue using drugs and was "at the end of her rope," having contemplated suicide. (Id.). Upon examination, plaintiff appeared anxious and her affect was depressed. (Id.). Plaintiff's admitting diagnoses were cocaine dependance and depressive disorder not otherwise specified, with a GAF[6] score of 40.[7] (Id.). Upon discharge, plaintiff reported that she

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas,

felt good, her affect was less labile, she appeared euthymic,[8] and she had insight regarding her circumstance. (Tr. 173). Plaintiff's discharge diagnoses were cocaine dependence, and psychotic disorder not otherwise specified, with a GAF score of 55.[9] (Tr. 172). Plaintiff was prescribed medication, including Haldol[10] and Ambien,[11] and was discharged to an outpatient setting. (Tr. 173). Plaintiff was instructed to follow-up at the Carol Jones Treatment Center. (Id.).

Plaintiff saw Chan K. Ngo, M.D. on February 4, 2005, for a follow-up from her hospital stay. (Tr. 235). Plaintiff reported that she had used cocaine two days prior and that she still used marijuana. (Id.). Plaintiff indicated that she had a "very big anger and attitude problem." (Id.). Plaintiff reported experiencing visual hallucinations and past suicidal ideations. (Id.). Plaintiff indicated that she had tried many medications, but the medication that helped her the most for anxiety was Xanax,[12] which she had bought from another person. (Id.). Dr. Ngo's impression was bipolar

---

such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

[8]Moderation of mood; not manic or depressed. Stedman's at 678.

[9]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[10]Haldol is indicated for the treatment of schizophrenic patients who require prolonged parenteral antipsychotic therapy. See Physician's Desk Reference (PDR), 2499 (59th Ed. 2005).

[11]Ambien is indicated for the short-term treatment of insomnia. See PDR at 2980.

[12]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. See PDR at 2764.

- 8 -

disorder with psychosis not otherwise specified, schizoaffective disorder,[13] anxiety, ADD,[14] and polysubstance abuse. (Tr. 236). Dr. Ngo started plaintiff on Seroquel[15] for mood stabilization, Ativan[16] for anxiety, and Ambien for sleep. (Id.). Dr. Ngo recommended that plaintiff see a counselor and keep her appointment with Carol Jones to work on her drug addiction. (Id.).

Plaintiff saw Linda Lewis, Psy.D. for a psychiatric evaluation on July 28, 2005. (Tr. 226-30). Plaintiff reported that she started using illegal drugs at the age of nine and that she had used every drug except heroin. (Tr. 229). Upon mental status exam, Dr. Lewis noted that plaintiff's behavior, attention, and cognition were within normal limits and that plaintiff was cooperative. (Tr. 230). Plaintiff's fund of information was satisfactory and her memory was intact. (Id.). Plaintiff's psychomotor activity was increased, her mood was dysphoric, and her judgment and insight were poor. (Id.). Plaintiff's affect was sad and tearful and plaintiff had racing thoughts. (Id.). Dr. Lewis diagnosed plaintiff with mixed bipolar disorder, generalized anxiety disorder,[17] and PTSD, with a GAF score of 60. (Id.). Dr. Lewis adjusted plaintiff's medications. (Id.).

Plaintiff saw Dr. Ngo on August 26, 2005, at which time she reported that she had been clean

---

[13]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. Stedman's at 570.

[14]A disorder of attention, organization and impulse control appearing in childhood and often persisting to adulthood. Stedman's at 568.

[15]Seroquel is a psychotropic drug indicated for the short-term treatment of acute manic episodes associated with bipolar I disorder. See PDR at 663.

[16]Ativan is indicated for the treatment of anxiety. See WebMD, http://www.webmd.com/drugs (last visited February 1, 2012).

[17]Chronic, repeated episodes of anxiety reactions; a psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 569.

from her drug use for thirty-six days. (Tr. 234). Plaintiff indicated that she quit going to Carol Jones the previous day due to "confidentiality problems." (Id.). Plaintiff was very anxious and requested something to calm her down. (Id.). Dr. Ngo diagnosed plaintiff with anxiety disorder and bipolar disorder, and prescribed Xanax. (Id.). Plaintiff saw Dr. Ngo again on September 9, 2005, at which time she reported that she was staying at Harmony House, a women's shelter, and that she had been clean fifty days. (Tr. 576). Plaintiff was very anxious and requested a change in medication. (Id.). Dr. Ngo diagnosed plaintiff with anxiety disorder and history of polysubstance abuse. (Id.). He prescribed Valium and instructed plaintiff to follow-up with Dr. Lewis. (Id.).

In a letter dated September 29, 2005, Ginger Williamson, Case Manager at Harmony House, stated that plaintiff was making "excellent progress" on her medications. (Tr. 237). Ms. Williamson stated that plaintiff had undergone urinalysis on September 22, 2005, which was clean. (Id.).

Plaintiff saw David J Lutz, Ph.D., Clinical Psychologist, on November 10, 2005, for a psychological evaluation upon the referral of the state agency. (Tr. 238-43). Plaintiff reported that she used marijuana one to three times weekly and that she had last used marijuana the morning of her examination. (Tr. 239). Plaintiff indicated that she used marijuana along with Xanax that she buys from others to help calm her down. (Id.). Upon mental status examination, Dr. Lutz noted that plaintiff was emotionally labile throughout the interview, crying on numerous occasions and at other times smiling sarcastically. (Tr. 241). Plaintiff had limited insight and poor judgment. (Id.). Dr. Lutz diagnosed plaintiff with depressive disorder not otherwise specified. (Tr. 242). He noted that plaintiff did not report symptoms consistent with bipolar disorder or psychotic symptoms. (Id.). Dr. Lutz stated "I attributed her difficulties primarily to drug usage and dysfunctional personality characteristics." (Id.). Dr. Lutz diagnosed plaintiff with polysubstance abuse "if not dependence."

- 10 -

(Id.).  He noted that plaintiff reported some excessive usage, including cocaine, within the past few

months; and that plaintiff may abuse not only cannabis but also prescription drugs currently.  (Id.).

Dr. Lutz also diagnosed plaintiff with rule out ADHD; and borderline personality disorder.[18]  (Id.).

Dr. Lutz assessed a GAF score of 50.[19]  (Id.).  Dr. Lutz concluded that plaintiff "seemed able to

understand and remember simple and moderately complex instructions but may have difficulty with

complex instructions.  She seemed able to sustain concentration and persistence on simple and

moderately complex tasks but would have difficulty with complex tasks.  She seemed able to interact

in at least moderately demanding social situations.  She seemed able to adapt to her environment."

(Id.).

G. Sutton, Ph.D. a non-examining state agency psychologist, completed a Psychiatric Review

Technique on November 29, 2005.  (Tr. 245-58).  Dr. Sutton diagnosed plaintiff with depression not

otherwise specified, bipolar disorder, and substance abuse.  (Id.).  Dr. Sutton expressed the opinion

that plaintiff's impairments resulted in mild limitations in plaintiff's activities of daily living, and

moderate limitations in plaintiff's ability to maintain social functioning and ability to maintain

concentration, persistence, or pace.  (Tr. 255).  Dr. Sutton also completed a Mental Residual

Functional Capacity Assessment, in which he found that plaintiff was moderately limited in her ability

---

[18]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilation, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone.  Stedman's at 568.

[19]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and be aware of normal hazards and take appropriate precautions. (Tr. 259-60). Dr. Sutton stated that plaintiff appeared able to understand, remember and carry out moderately complex instructions; interact with the general public, co-workers, and supervisors on a limited basis; and adapt to low hazard work settings. (Tr. 261).

Plaintiff saw Joan Bender, Ph.D, Clinical Psychologist, on June 27, 2007, for a psychological evaluation at the request of a state agency to determine eligibility for medical assistance. (Tr. 268-71). Plaintiff reported that she had not used marijuana in six months, when she was placed on probation and must undergo biweekly urinalysis. (Tr. 268). Plaintiff reported four psychiatric hospitalizations for suicide attempts. (Tr. 269). Plaintiff reported a history of traumatic brain injury, and severe physical and sexual abuse beginning in childhood. (Tr. 271). Plaintiff also reported learning problems. (Id.). Upon mental status examination, plaintiff was cooperative and polite, and cried off and on throughout the interview when talking about past trauma. (Tr. 270). Plaintiff was able to give history, in terms of memory functioning, but was somewhat scattered in giving information. (Id.). Plaintiff had trouble when trauma and abuse were brought up and in general seemed overwhelmed. (Id.). Plaintiff reported hearing voices telling her to kill herself, periods of energy and happiness, frequent nightmares, flashbacks to abuse, temper problems, violent episodes, and panic attacks. (Id.). Dr. Bender diagnosed plaintiff with recurrent major depression; PTSD; panic disorder with agoraphobia; cannabis dependence, six months full remission; likely borderline intellectual functioning; and a GAF score of 40. (Tr. 271). Dr. Bender found that plaintiff was able to understand and recall simple instructions. (Id.). Dr. Bender stated that plaintiff was unable to

concentrate and persist on even simple tasks for full-time work due to the severity of the depression and anxiety disorders.  (Id.).  Dr. Bender found that plaintiff would have trouble with the interpersonal aspects of work because of temper and anxiety.  (Id.).  Dr. Bender stated that plaintiff could adapt to change and likely could mange her own funds.  (Id.).  Dr. Bender noted that plaintiff was not in any treatment.  (Id.).  Dr. Bender expressed the opinion that plaintiff appeared disabled for full-time work, and that this was likely to be the case for at least the next twelve months.  (Id.).  Dr. Bender noted that it was possible that with appropriate medication and counseling, plaintiff may gradually improve although this was likely to be slow and uncertain.  (Id.).

Dr. Bender also completed a Medical Source Statement regarding plaintiff's mental impairments, in which she expressed the opinion that plaintiff was mildly limited in her ability to remember locations and work-like procedures, respond appropriately to changes in the work setting, and be aware of normal hazards; and moderately limited in her ability to set realistic goals or make plans independently of others.  (Tr. 274-77).  Dr. Bender found that plaintiff was markedly limited in all other abilities, including all areas of sustained concentration and persistence, and all areas of social interaction.  (Id.).  Dr. Bender indicated that plaintiff's impairments would cause her to be absent from work more than four days per month.  (Tr. 277).  Dr. Bender stated that plaintiff "has severe depression with paranoia and auditory hallucinations, severe PTSD with temper problems, severe panic attacks, and brain injury as well as history of being a slow learner.  She is not able to function under any stress or around other people and cannot handle a job with even simple tasks."  (Tr. 278).

Plaintiff saw Dr. Ngo on September 25, 2007, at which time plaintiff was anxious and tearful and requested medication.  (Tr. 574).  Dr. Ngo noted that plaintiff had a history of marijuana use in

- 13 -

the past but had not used in six months.  (Tr. 575).  Dr. Ngo diagnosed plaintiff with unspecified psychoactive substance abuse, marijuana use, in remission; depression; and anxiety disorder not otherwise specified.  (Id.).  He prescribed medication.  (Id.).

Plaintiff saw Sharol L. McGehee, Psy.D., Licensed Psychologist, on September 26, 2007, upon the referral of her attorney.  (Tr. 281-84).  Plaintiff reported that she was addicted to marijuana in the past, but had been clean for nine months.  (Tr. 282).  Plaintiff reported hallucinations and delusions.  (Tr. 281).  Dr. McGehee administered psychological testing, which revealed among other things, that plaintiff was "psychotic."  (Tr. 283).  Dr. McGehee found that plaintiff appeared manic during the interview and plaintiff indicated that when she is manic she is homicidal and suicidal.  (Id.). Dr. McGehee noted that plaintiff was withdrawn and alienated from other people.  (Id.).  Dr. McGehee stated that plaintiff's thought processes were distorted and that she had poor contact with reality.  (Id.).  Dr. McGehee found that plaintiff was severely impaired in all four domains: understanding and memory; concentration and persistence; social interaction; and skills of adaption. (Id.).  Dr. McGehee stated that plaintiff had serious difficulty with concentration and being able to stay on tasks.  (Id.).  Dr. McGehee noted that, although plaintiff could carry out short, simple instructions and make simple work related decisions, she had difficulty working with other people following directions, and performing activities within a schedule, maintaining attendance, and being punctual.  (Id.).  Dr. McGehee stated that plaintiff did not do well with people; and that her social interaction skills were limited and she was unable to set realistic goals or make plans independently of others.  (Id.).  Dr. McGehee diagnosed plaintiff with bipolar I disorder, most recent episode manic, severe with psychotic features; personality disorder not otherwise specified; and a GAF score of 31. (Tr. 283-84).

- 14 -

Dr. McGehee completed a Medical Source Statement-Mental, in which she expressed the opinion that plaintiff was moderately limited in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation; and markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with others without being distracted by them, complete a normal workday and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers, and set realistic goals or make plans independently of others. (Tr. 287-88). Dr. McGehee indicated that plaintiff had a history of drug or alcohol abuse and that her opinion set forth only the limitations remaining if plaintiff stopped using or abusing drugs or alcohol. (Tr. 289). Dr. McGehee found that plaintiff would likely be absent from work more than four days per month due to her symptoms. (Id.).

Plaintiff underwent alcohol/drug treatment at Southeast Missouri Community Treatment Center, Inc. from October 5, 2007, through October 23, 2007. (Tr. 293-94). At the time of admission, plaintiff stated that she "would rather die than continue using." (Tr. 293). In an "Addiction Severity Index" created on October 8, 2007, it was noted that in the prior thirty days, plaintiff had used cocaine fourteen times, used amphetamines one time, and used other sedatives/hypnotics/tranquilizers two times. (Tr. 297). It was indicated that plaintiff had abstained from cocaine for a six-month period, but this period of abstinence ended eight months prior. (Id.).

Plaintiff was discharged for noncompliance due to a violent outburst. (Tr. 293). Plaintiff's discharge diagnoses were polysubstance dependence, and schizoaffective disorder, with a current GAF score of 47 and the highest GAF score in the past year of 54. (Tr. 294).

Plaintiff was admitted to residential drug treatment at Carol Jones Recovery Center for Women on December 4, 2007. (Tr. 322). In an Addiction Severity Index completed on December 7, 2007, it was noted that cocaine was plaintiff's drug of choice and that she had used it for the past three years, sometimes daily. (Tr. 322). Plaintiff had used cocaine two times in the prior thirty days. (Id.). Plaintiff had last used on December 3, 2007. (Tr. 322). It was noted that plaintiff had abstained from cocaine use for a two-month period, but this period of abstinence ended eight months prior. (Tr. 312). Plaintiff reported that her secondary drug of choice was marijuana, and that she had last used three months prior. (Tr. 322). Plaintiff underwent urinalysis on December 4, 2007, which was positive for cocaine. (Id.). Plaintiff was diagnosed with polysubstance dependence, cocaine dependence, cannabis dependence, major depressive disorder recurrent severe, PTSD, and was given a GAF score of 45. (Tr. 323).

## C.     Medical Records Submitted to Appeals Council

Plaintiff presented to Annie E. Beatty, Psy.D. for a psychological evaluation on December 20, 2007. (Tr. 559-61). Plaintiff reported a history of depression and substance abuse. (Tr. 559). Dr. Beatty noted that plaintiff had been participating in Carol Jones Recovery Center for the past three weeks on the inpatient unit. (Tr. 560). Plaintiff reported that she had used cocaine for a period of two-and-a-half years with her last use being in later October of 2007. (Id.). Plaintiff reported that she participated in a treatment program in October of 2007, although she relapsed for one week upon her discharge. (Id.). Upon mental status examination, Dr. Beatty found that plaintiff was alert and

responsive; her long-term memory and ability to relate were intact, her sequential personal history was fairly good; her thought processes appeared productive, relevant, and coherent; her speech was at times pressured and rapid; her affect was pleasant; her mood was congruent; and no indication of psychotic processes was noted. (Tr. 560-61). Dr. Beatty noted that plaintiff reported depressive symptoms as well as intermittent anxiety symptoms. (Tr. 561). Dr. Beatty diagnosed plaintiff with cannabis dependence, early partial remission; cocaine dependence, early partial remission; and depressive disorder not otherwise specified; with a GAF score of 55. (Id.). Dr. Beatty encouraged plaintiff to continue her participation in the Carol Jones Recovery program in order to maintain her sobriety. (Id.).

Plaintiff saw Dr. Ngo on December 11, 2007, at which time plaintiff reported that she was "doing well and staying away from drugs." (Tr. 573).

Plaintiff saw Phyllis Harter, NP, on February 7, 2008, at which time it was noted that plaintiff had completed inpatient treatment for cocaine abuse. (Tr. 601). Plaintiff complained of irritability but had no complaints of depression. (Id.). It was noted that plaintiff expressed a "desire to continue living." (Id.). Plaintiff saw Ms. Harter again on March 19, 2008, at which time plaintiff reported that she was "doing well." (Tr. 599). Plaintiff's mental status examination was normal. (Id.).

Plaintiff underwent counseling on three occasions from February 2008 through May 2008. (Tr. 564-65). Plaintiff primarily discussed problems she was having with her husband at each session. (Id.).

Plaintiff was admitted to St. John's Regional Health Center on April 11, 2008, after having ingested lithium in excess of that prescribed. (Tr. 478). Plaintiff admitted to depression and was agitated and crying. (Id.). Plaintiff reportedly wanted to die. (Tr. 482). Plaintiff was discharged on

April 14, 2008, with diagnoses of mood disorder not otherwise specified, impulse control disorder not otherwise specified, rule out substance-induced mood disorder, and a GAF score of 50. (Tr. 480). Plaintiff denied any suicidal ideation. (Tr. 481). Plaintiff was advised to follow-up with her primary care physician. (Id.).

Plaintiff received treatment from Dr. Greg Zolkowski on April 28, 2008, and May 12, 2008. (Tr. 587-88). Dr. Zolkowski diagnosed plaintiff with anxiety and bipolar disorder, and prescribed medication. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since August 31, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571, *et seq.*, 416.920(b) and 416.971, *et seq.*).

3.    The claimant has the following severe impairments: Major depressive disorder/affective mood disorder, diagnosed as depressive disorder, not otherwise specified; bipolar disorder; post-traumatic stress disorder; panic disorder with agoraphobia; personality disorder, not otherwise specified; polysubstance dependence, currently in remission; and monocular left vision with history of retinal detachment (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant's impairments, including the substance abuse disorder, meet the clinical criteria of listings 12.04 and 12.06 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.    If the claimant stopped the substance abuse, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

6.    If the claimant stopped the substance abuse, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the

- 18 -

impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

7.      If the claimant stopped the substance abuse, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following limitations: Secondary to possible decreased mobility, she is unable to perform work involving exposure to or climbing of significant unprotected heights, involving exposure to potentially dangerous, unguarded moving machinery or involving commercial driving.  Secondary to decreased depth perception, she is limited to work performed on an even surface.  She is also limited to work that does not require more than monovision (i.e., limited depth perception/field of vision).  She is limited to work that is simple and repetitive in nature (i.e., involves only 1, 2 or 3 steps), involves no public contact or customer service, involves minimal proximity to co-workers and supervisors, involves no teamwork, involves minimal use of independent judgment and involves minimal need to experience change in the work setting.  These limitations are secondary to her psychological diagnoses.  Secondary to her marginal education, she is limited to work that involves only simple rote words and involves no mathematics other than simple addition/subtraction.

8.      If the claimant stopped the substance abuse, the claimant would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).

9.      The claimant was born on March 17, 1977, and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

10.     The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.     If the claimant's substance abuse were not taken into account, considering her age, education, work experience and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

13.     Because the claimant would not be disabled if she stopped the substance abuse (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance abuse disorder is a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).  Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 16-24).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on August 4, 2005, the claimant is not disabled under sections 216(I) and  223(d) of the Social Security Act.

> Based on the application for supplemental security income filed on August 4, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

 (Tr. 24).

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a

- 20 -

"searching inquiry."  Id.

## B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one

- 21 -

of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the Commissioner erred in failing to consider new and material evidence presented to the Appeals Council.  Plaintiff next argues that the ALJ erred in determining

plaintiff's residual functional capacity.  Plaintiff also argues that the ALJ erred in rejecting the opinions of plaintiff's examining providers regarding her limitations.  Plaintiff finally argues that the ALJ erred in drawing improper conclusions regarding plaintiff's alleged substance abuse in determining plaintiff's residual functional capacity.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's residual functional capacity determination.

**1.      Residual Functional Capacity**

Plaintiff argues that the residual functional capacity ("RFC") assessed by the ALJ is not supported by the medical evidence.  Plaintiff also contends that, in determining plaintiff's RFC, the ALJ improperly rejected the opinions of examining providers and improperly evaluated plaintiff's alleged substance abuse.

In 1996, the Social Security Act was amended to reflect changes in the award of benefits with respect to claimants suffering from a substance use disorder.  The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  Under the Commissioner's implementing regulations, 20 C.F.R. § 404.1535(b), the Commissioner must first determine whether the claimant is disabled  without segregating out any effects that might be due to substance use disorders. . . .  If the gross total of a claimant's limitations, including the effects of substance use disorders suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent.  Brueggeman v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2008) (citations omitted).

Here, the ALJ followed this procedure and found that plaintiff's impairments, including the

substance abuse disorder, meet listings 12.04 and 12.06. (Tr. 17). The ALJ next found that, if plaintiff stopped the substance abuse, plaintiff would continue to have a severe impairment or combination of impairments, but plaintiff's impairments would not meet or medically equal a listing (Tr. 21). The ALJ concluded that, if plaintiff stopped the substance abuse, she could perform jobs that exist in significant numbers in the national economy. (Tr. 23). The question remains as to whether substantial evidence supports this conclusion, or put another way, whether substantial evidence supports the ALJ's RFC assessment.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

- 25 -

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> If the claimant stopped the substance abuse, the claimant would have the residual functional capacity to perform a full range of work at all exertional levels but with the following limitations: Secondary to possible decreased mobility, she is unable to perform work involving exposure to or climbing of significant unprotected heights, involving exposure to potentially dangerous, unguarded moving machinery or involving commercial driving.   Secondary to decreased depth perception, she is limited to work performed on an even surface.  She is also limited to work that does not require more than monovision (i.e., limited depth perception/field of vision).   She is limited to work that is simple and repetitive in nature (i.e., involves only 1, 2 or 3 steps), involves no public contact or customer service, involves minimal proximity to co-workers and supervisors, involves no teamwork, involves minimal use of independent judgment and involves minimal need to experience change in the work setting.   These limitations are secondary to her psychological diagnoses.  Secondary to her marginal education, she is limited to work that involves only simple rote words and involves no mathematics other than simple addition/subtraction.

(Tr. 21-22).

In support of her determination, the ALJ first discussed plaintiff's statements regarding her daily activities.  The ALJ noted that plaintiff reported in a SSA questionnaire that she was able to care for her young daughter, prepare meals on a daily basis, clean her house, leave her residence "all the time," take walks, drive a car, use public transportation, go out alone, shop for groceries and other items (sometimes for five to six hours at a time), count change, do home decorating projects, attend movies and social events with friends, visit a park, and visit friends at their homes.  (Tr. 22, 115-22). The ALJ stated that the medical records do not support plaintiff's allegation that she is disabled by impairments other than substance abuse.  (Tr. 22).  The ALJ then indicated that she was giving "little weight" to the opinions of Drs. McGehee and Bender because neither doctor addressed plaintiff's "on-going abuse of cocaine (and possibly methamphetamine and prescription drugs) in evaluating her mental residual functional capacity."  (Id.).  Finally, the ALJ indicated that she was accepting the opinion of the non-examining state agency psychologist as consistent with the evidence of record.

- 26 -

(Id.).

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because it does not incorporate the limitations found by Drs. McGehee and Bender.  Drs. McGehee and Bender were both one-time consulting psychologists, who expressed opinions regarding plaintiff's mental work-related limitations.  Both psychologists found that plaintiff had significant limitations, which would preclude her from working.  Plaintiff points out that Dr. McGehee specifically noted that plaintiff's limitations would remain in the absence of drug or alcohol abuse. (Tr. 289).

On June 27, 2007, plaintiff reported to Dr. Bender that she had not used marijuana in six months.  (Tr. 268).  Significantly, plaintiff did not report her cocaine use.  Plaintiff reported significant symptoms to Dr. Bender, including hearing voices telling her to kill herself.  (Tr. 270). Dr. Bender diagnosed plaintiff with, among other things, major depression; PTSD; panic disorder with agoraphobia; and cannabis dependance, six months full remission.   (Tr. 271).

Similarly, on September 26, 2007, plaintiff reported to Dr. McGehee that she had been addicted to marijuana in the past, but she had been clean for nine months. (Tr. 282).  Plaintiff did not report her cocaine use.  Plaintiff complained of significant psychiatric symptoms to Dr. McGehee, including hallucinations and delusions. (Tr. 281).  As a result, Dr. McGehee found that plaintiff was "psychotic." (Tr. 283).  Dr. McGehee checked a box indicating that plaintiff had a "history which includes drug or alcohol abuse/addiction," and that her Medical Source Statement set forth her "professional opinion of only the limitations remaining if [plaintiff] stopped using or abusing drugs or alcohol." (Tr. 289).

Nine days after she saw Dr. McGehee, on October 5, 2007, plaintiff sought drug treatment

at Southeast Missouri Community Treatment Center. (Tr. 293-94). Upon admission, plaintiff stated that she "would rather die than continue using." (Tr. 293). On October 8, 2007, during her stay, plaintiff reported that she had been using cocaine for three years and that in the prior thirty days, she had used cocaine fourteen times, amphetamines one time, and other sedatives/hypnotics/tranquilizers two times. (Tr. 297). It was indicated that plaintiff had abstained from cocaine for a six-month period, but this period of abstinence ended eight months prior. (Id.). In addition, plaintiff was admitted to residential drug treatment in December 4, 2007, at which time she reported using cocaine two times in the prior thirty days. (Tr. 312). It was noted that plaintiff's last period of abstinence from cocaine ended eight months prior. (Id.). Plaintiff underwent urinalysis on December 4, 2007, which was positive for cocaine. (Id.).

The undersigned finds that the ALJ properly evaluated the opinions of Drs. McGehee and Bender. The ALJ rejected these opinions because they did not address plaintiff's abuse of drugs in evaluating her mental RFC. Although plaintiff appears to argue that Drs. McGehee and Bender indicated that the limitations they found would remain in the absence of plaintiff's drug abuse, this argument fails as Drs. McGehee and Bender were unaware that plaintiff was using drugs at the time she was evaluated. Subsequent medical records reveal that plaintiff was, in fact, using cocaine at the time of her evaluations. As such, the ALJ's decision to reject the opinions of Drs. McGehee and Bender was supported by substantial evidence.

The undersigned further finds that the ALJ's residual functional capacity determination is supported by substantial evidence. The objective medical evidence supports the finding of the ALJ that, if plaintiff stopped using cocaine, she would be capable of performing a limited range of unskilled work. Plaintiff was admitted at St. John's Regional Health Center from January 18, 2005

through January 24, 2005, for treatment for depression and cocaine dependence. (Tr. 172-73).  At the time of admission, plaintiff complained of mood lability and reported suicidal thoughts.  (Tr. 172).  Upon discharge, however, plaintiff reported that she felt good, her affect was less labile, she appeared euthymic, and she had insight regarding her circumstances.  (Tr. 173).  Plaintiff saw Dr. Linda Lewis for a psychiatric evaluation on July 28, 2005,at which time Dr. Lewis found that plaintiff's behavior, attention, and cognition were within normal limits; her fund of information was satisfactory; and her memory was intact.  (Tr. 230).  Although Dr. Lewis also noted that plaintiff's judgment and insight were poor and she had racing thoughts, she assigned a GAF score of 60, which is indicative of only moderate limitations.  (Id.).  In addition, plaintiff saw consultative psychologist Dr. Lutz on November 10, 2005, at which time she reported that she had used marijuana the morning of her examination.  (Tr. 239).  Although Dr. Lutz found that plaintiff was emotionally labile throughout the interview and demonstrated limited insight and poor judgment, he attributed plaintiff's symptoms "primarily to drug usage and dysfunctional personality characteristics."  (Tr. 242).  Further, Dr. Lutz found that plaintiff was capable of understanding and remembering simple and moderately complex instructions, sustaining concentration and persistence on simple and moderately complex tasks, interacting in at least moderately demanding social situations, and adapting to her environment.  (Id.).  Finally, the state agency psychologist, Dr. Sutton, expressed the opinion that plaintiff was capable of understanding, remembering, and carrying out moderately complex instructions; interacting with the general public, co-workers, and supervisors on a limited basis; and adapting to low hazard work settings.  (Tr. 261).  As such, the residual functional capacity formulated by the ALJ is supported by the record as a whole, including the objective medical evidence.

2.      **New Evidence**

Plaintiff argues that the Commissioner erred in failing to consider new evidence submitted

to the Appeals Council after the ALJ's March 2008 decision.  Plaintiff contends that this new

evidence reveals that her substance abuse was in remission at significant times and supports her

claim for benefits.

Title 20 C.F.R. § 404.970(b) provides that "[i]f new and material evidence is submitted, the

Appeals Council shall consider the additional evidence only where it relates to the period on or

before the date of the administrative law judge hearing decision.  The Appeals Council shall

evaluate the entire record including the new and material evidence submitted if it relates to the

period on or before the date of the administrative law judge hearing decision."  "To be 'new,'

evidence must be more than merely cumulative of other evidence in the record."  Bergmann v.

Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).  "To be 'material,' the evidence must be relevant to

[the] claimant's condition for the time period for which benefits were denied."  Id.  "Where . . . the

Appeals Council considers new evidence but denies review, [the Court] must determine whether

the ALJ's decision was supported by substantial evidence on the record as a whole, including the

new evidence."  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

In its decision denying plaintiff's request for review, the Appeals Council stated that, "[i]n

looking at your case, we considered...the additional evidence listed on the enclosed Order of

Appeals Council."  (Tr. 6).  The order lists the following exhibits: (1) "[M]edical records from

Burrell Behavioral Health dated 11/02/87-07/31/93;" (2) "Medical records from St. Johns Hospital

dated 01/18/05-04/14/08;" (3) "Psychological evaluation and progress notes from Ozarks

Community Hospital and Ann Beatty, Ph.D dated 12/20/07-05/07/08;" (4) "Treatment records

from Jordan Valley Health Center dated 2/4/05-4/9/08, and a discharge summary from St. Johns

Health Center dated 4/11/08;" and (5) "Treatment notes from Dr. Greg Zolkowski dated 04/28/08

and 05/12/08 and medical records from Polk County Clinic dated 02/04/05-04/22/08."  (Tr. 5).  It

is evident that the Appeals Council did consider the evidence cited by plaintiff.  As such, this court

must determine whether the ALJ's decision was supported by substantial evidence on the record as

a whole, including the new evidence.  See Davidson, 501 F.3d at 990.

      The undersigned finds that the additional records submitted to the Appeals Council support

the ALJ's determination that plaintiff is not disabled.  The new evidence includes a report from a

December 20, 2007 psychological evaluation performed by Dr. Annie Beatty while plaintiff was an

inpatient at the Carol Jones Recovery Center.  (Tr. 559-61).  Plaintiff reported that she had used

cocaine for a period of two-and-a-half years, with her last use being in October of 2007.  (Tr. 560).

Dr. Beatty found that plaintiff was alert and responsive; her long-term memory and ability to relate

were intact; her sequential personal history was fairly good; her thought processes appeared

productive, relevant, and coherent; her speech was at times pressured and rapid; her affect was

pleasant; her mood was congruent; and no indication of psychotic processes was noted.  (Tr. 560-

61).  Dr. Beatty diagnosed plaintiff with cannabis dependence, early partial remission; cocaine

dependence, early partial remission; and depressive disorder not otherwise specified; with a GAF

score of 55.  (Tr. 561).  Dr. Beatty encouraged plaintiff to continue her participation in the Carol

Jones Recovery program in order to maintain her sobriety.  (Id.).

      Dr. Beatty's opinion supports the ALJ's finding that plaintiff would not be disabled if she

stopped her substance abuse.  Plaintiff reported that she had used cocaine for two-and-a-half years

and that she has last used in October 2007.  This is consistent with the ALJ's finding that plaintiff

was using cocaine at the time she saw Drs. McGehee and Bender.  Plaintiff was not using cocaine at the time of her evaluation and Dr. Beatty found no psychotic symptoms, and assessed a GAF score of 55, which is indicative of only moderate limitations.  Further, Dr. Beatty noted that plaintiff was alert and responsive, her long-term memory and ability to relate were intact, her sequential personal history was fairly good, her affect was pleasant, and her thought processes appeared productive, relevant, and coherent.

The remainder of the new records also support the ALJ's determination.  On December 11, 2007, plaintiff saw Dr. Ngo, at which time plaintiff reported that she was "doing well and staying away from drugs." (Tr. 573).  In addition, on February 7, 2008, plaintiff saw nurse practitioner Phyllis Harter, at which time plaintiff complained of irritability but had no complaints of depression.  (Tr. 601).  Plaintiff expressed a "desire to continue living," at this time.  (Id.).  On March 19, 2008, plaintiff reported to Ms. Harter that she was "doing well," and plaintiff's mental status examination was normal.  (Tr. 599).  Plaintiff underwent counseling in February 2008, at which time she primarily complained of problems she was having with her husband.  (Tr. 564-65).

Plaintiff also submitted records dated after the ALJ's decision, including treatment notes from an April 11, 2008 admission to St. John's Regional Health Center, and treatment notes from Dr. Greg Zolkowski dated April 28, 2008 and May 12, 2008.  (Tr. 478-82).  While these records are not necessarily inconsistent with the ALJ's decision, if plaintiff's condition worsens, plaintiff's recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case.  See Riley v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994).

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole, including the new evidence submitted to the Appeals Council.

**<u>Conclusion</u>**

Substantial evidence in the record as a whole supports the decision of the ALJ finding

plaintiff not disabled because the evidence of record supports the ALJ's finding that if plaintiff

stopped the substance abuse, she would have the residual functional capacity to perform a limited

range of unskilled work.  Accordingly, Judgment will be entered separately in favor of defendant in

accordance with this Memorandum.


Dated this   6th   day of February, 2012.


LEWIS M. BLANTON
UNITED  STATES  MAGISTRATE  JUDGE

- 33 -